**NADER 2000 PRIMARY COMMITTEE, INC., Ralph Nader, Winona Laduke, Martha Murray, and Mark Dunlea, Plaintiffs,**

**v.**

**Ken HECHLER, Secretary of State for the State of West Virginia, Defendant.**

**No. Civ.A. 2:00–0839.**

United States District Court, S.D. West Virginia, Charleston Division.

Sept. 15, 2000.

Jason Huber, Forman & Crane, Charleston, WV, for plaintiffs.

Elizabeth Daniel, Brennan Center for Justice at New York University School of Law, New York City, for plaintiffs.

Hon. Darrell V. McGraw, Jr., Attorney General, Robert D. Williams, Office of the Attorney General, Charleston, WV, for defendant.

### MEMORANDUM OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

HADEN, Chief Judge.

Pending is Plaintiffs' Motion for a Preliminary Injunction. At a hearing on Plaintiffs' motion came Plaintiffs by Elizabeth Daniel and Jason Huber and came Defendant by Robert D. Williams and Donald L. Darling, Assistant Attorneys General of West Virginia. The parties submitted the issue on oral arguments and the briefs. On that basis, the Court **GRANTS** Plaintiffs' motion for preliminary injunction.

### I. FINDINGS OF FACT

On September 7, 2000 Plaintiffs, the Nader 2000 Primary Committee, Inc., Ralph Nader, Winona LaDuke, Martha Murray (a West Virginia resident and registered voter), and Mark Dunlea (a New York resident and registered voter) filed their Complaint and a motion for preliminary injunction, seeking to have Ralph Nader and Winona LaDuke put on West Virginia's 2000 Ballot as candidates for the offices of President and Vice President of the United States, respectively. Defendant Hechler declined to certify Nader and LaDuke as candidates for the offices because they failed to submit the number of signatures of registered voters required by

West Virginia code § 3–5–23(c), as amended.

West Virginia Code § 3–5–23(c), amended effective July 1, 1999, now requires certifications containing the signatures of registered voters totaling not less than two (2) percent of the entire vote cast at the last preceding general election for the office in question. Prior to July 11, 1999 a candidate unaffiliated with the two major political parties wishing to gain ballot access was required to submit only signatures of registered voters totaling not less than one (1) percent of the entire vote cast at the last preceding general election for the office in question. Based upon West Virginia's 1996 election results for the office of President of the United States, the number of signatures required of any certificate nominee seeking ballot access for the offices of President and Vice President of the United States on the West Virginia 2000 election ballot prior to June 11, 1999 was 6,365. After June 11, 1999, under the amended statute, the number has increased to 12,730. (Br. in Resp. to Pls.' Mot. for Prelim. Inj. at 3.) The amended statute took effect in the midst of the 2000 general election cycle, which resulted in the imposition of different requirements on candidates for the same office.

West Virginia Code § 3–5–23(b) also requires individuals circulating petitions to be registered voters in West Virginia, thereby precluding the use of out-of-state circulators.

One candidate, John Hagelin of the Natural Law Party, qualified for the presidential ballot under the one (1) percent requirement. Hagelin filed nomination certificates containing valid signatures in excess of 6,365 on July 10, 1999, one day before the two (2) percent requirement took effect.

Nader and LaDuke filed after the effective date of the amended statute and were held to the two (2) percent requirement. They submitted 7,111 valid signatures, which satisfied the old requirement of one (1) percent, but failed to satisfy the new two (2) percent requirement. Plaintiffs contend that a crucial reason for not obtaining the requisite number of signatures was West Virginia's requirement that only individuals registered to vote in West Virginia could circulate petitions for signatures. In an affidavit submitted in support of Plaintiffs' Motion for Preliminary Injunction, Todd Main, Field Director of Ralph Nader's Presidential Campaign, averred that the Nader campaign did not use its regular, experienced circulators, many from other states who obviously were not registered to vote in West Virginia, in an attempt to comply with West Virginia law. Main asserts that had the Nader Campaign been permitted to utilize their experienced circulators who were not registered voters, those circulators could have obtained 150 signatures each a day and could have easily obtained valid signatures in excess of 12,730. Main also attests West Virginia's two (2) percent signature requirement is one of the most burdensome in the country. (Main Affidavit at 4–5.)

## II. DISCUSSION

### A. Preliminary Injunction Standard

The Court applies a balancing test to determine whether a preliminary injunction is properly granted. *See Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977). The sequential application of the *Blackwelder* factors was discussed most recently in *Steakhouse, Inc. v. City of Raleigh, North Carolina:*

In deciding whether to grant a preliminary injunction, the district court is to consider three factors. First, it must balance the likelihood of irreparable harm to the plaintiff if the injunction is refused against the likelihood of irreparable harm to the defendant if it is granted. Second, the court should consider the likelihood that the plaintiff will succeed on the merits. The more the balance of harms leans away from the

plaintiff, the stronger his showing on the merits must be. Finally, the court must consider the public interest.

166 F.3d 634, 637 (4th Cir.1999) (citing *Blackwelder*). The plaintiff bears the burden of proving the factors favor the grant of an injunction. *See Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.1997).

■ In applying the balancing test, the most important factors are the two factors regarding the balancing of harms. *Id.* A plaintiff must demonstrate harm that is " 'neither remote nor speculative, but actual and imminent.' " *Id.* (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2nd Cir.1989)). If, after balancing the harm to the plaintiffs if the injunction were not granted against the harm to the defendants if the injunction were granted,

> the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' As the balance tips away from the plaintiff, a stronger showing on the merits is required.

*Id.* (citations omitted).

Finally, the Court notes that " '[T]he grant of interim relief [is] an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it.' " *Steakhouse*, 166 F.3d at 637 (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir.1991)).

## B. West Virginia Statute Regulating Ballot Access of Independent, Minor Candidates

Plaintiffs' Complaint and Motion for Preliminary Injunction alleges West Virginia Code § 3–5–23 violates rights 'guaranteed by the First and Fourteenth Amendments. Specifically, Plaintiffs claim that, first, the change in the signature requirement from one (1) percent to two (2) percent in the same election cycle is unreasonably onerous, violates a potential candidate's First Amendment rights and is therefore unconstitutional. Second, Plaintiffs claim West Virginia's particular requirement that petition circulators be registered voters in this State is unconstitutional and violates Plaintiffs' First Amendment rights of free speech and political expression, and free association. Third, Plaintiffs allege that the pre- and post-amendment application of West Virginia Code § 3–5–23 results in exposing candidates to differing requirements for the same office in the same election because of when they filed, in violation of the Equal Protection and Due Process clauses of the Fourteenth Amendment. Finally, Plaintiffs assert that by virtue of the application of unconstitutional requirements, some West Virginia voters are denied their First Amendment right to vote for the candidate of their choice.

To remedy these claimed violations of constitutional rights, Plaintiffs request a preliminary injunction that will order the Defendant Secretary of State and Chief Election Officer Hechler to place Ralph Nader, Winona LaDuke, and the Green Party, on the presidential ballot.

## C. Application of the Blackwelder Standard

■ In the Complaint and Motion for Preliminary Injunction, Plaintiffs allege possible violations of First Amendment rights of at least three similar but different interests. Ralph Nader and Winona LaDuke have First Amendment interests of free speech and political expression in being on the ballot and interests of free association in using circulators of their choice to disseminate their message. The Green Party has First Amendment interests of free speech and political expression in having their nominee represented on the ballot. The Plaintiff West Virginia voter who wishes to cast a vote for Ralph

Nader and his vice presidential choice has First Amendment interests of free speech and political expression in voting for the candidate of her choice.[1] It is well-established that "[t]he loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 353, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (citing *New York Times v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)).

■ As a countervailing consideration, Defendant asserts the State will suffer irreparable harm if the preliminary injunction is issued because it will be forced to expend additional effort and money in adding Nader/Duke to the ballot.[2] Nonetheless, in light of the types of harm at issue, *i.e.* First Amendment violations versus increased monetary expenditures, the balance tips decidedly in favor of the Plaintiffs, who thus satisfy the first prong of the *Blackwelder* test.

Clearly, Plaintiffs' claims and requested relief allege serious, substantial, and difficult First Amendment, and possibly Fourteenth Amendment, issues and questions of law.

For example, Plaintiffs have demonstrated a substantial likelihood of success on the merits in light of the United States Supreme Court's decision in *Buckley v. American Constitutional Law Foundation, Inc.,* 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), which held Colorado's requirement that initiative petition circulators be registered voters unconstitutional. *Buckley* strongly suggests the West Virginia statute's resident registered voter requirement for petition circulators is presumptively unconstitutional.[3] *See also, Krislov v. Rednour,* —— F.3d ——, 2000 WL 1268134, No. 99–3801 (7th Cir. Sept.5, 2000). At this juncture, the Court need not resolve the ultimate issue of whether West Virginia's voter registration requirement is unconstitutional.

Under *Blackwelder,* it need not do so. It is enough that Plaintiffs have made a strong showing of difficult and substantial legal questions and, indeed, a likelihood of success on the merits as to one key issue.

Finally regarding *Blackwelder's* public interest consideration, as recognized in *Buckley, supra,* States "have considerable leeway to protect the integrity and reliability ... [of the] election processes generally."

1. She presumably represents as well the interests of the 7000 + signatories of the Nader petition, all certified West Virginia voters.

2. The State concedes it continued the ballot printing process even in light of the pending challenge.

Defendants also assert a *laches* argument and claim, in essence, that Plaintiffs brought this harm upon themselves by failing to raise these constitutional issues prior to the eleventh hour. *Laches* can, in some circumstances, serve as a defense to First Amendment claims. *See e.g. Gay Men's Health Crisis v. Sullivan,* 733 F.Supp. 619, 631 (S.D.N.Y. 1989) (suggesting that, in appropriate circumstances, *laches* could bar First Amendment claims). *Laches* is an attractive argument against Nader, LaDuke, and the Green Party, *sophisticated participants in a national election* who had knowledge of West Virginia's ballot access laws and should have been aware of important constitutional case law. However, the same cannot be said for regis-

tered voters like Plaintiff Martha Murray. Ordinary citizens should not be forced to anticipate and predict possible constitutional violations and be burdened with protecting against them, on pain of losing their rights. Registered voters in West Virginia should not have to sacrifice First Amendment rights because the State interposed unconstitutional requirements on individuals seeking ballot access, even when such individuals may have failed to act with dispatch to challenge the law.

3. Other difficult and substantial constitutional issues are present as well, including whether (a) the one (1) percent versus two (2) percent change in mid-election cycle works a violation of the Equal Protection Clause as applied to the Plaintiffs; (b) whether the West Virginia petition process *in toto* (requiring two (2) percent plus informing potential signers of loss of right to vote in primary plus requiring in-state circulators) adds up to an undue burden on Plaintiffs' core political speech rights; and (c) the appropriate remedy in the case.

We have several times said 'no litmus-paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions; we have come upon 'no substitute for the hard judgments that must be made.'

*Id.* at 192, 119 S.Ct. 636 (citing *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)). However, *Buckley* cautions that "the First Amendment requires us to be vigilant in making those judgments, to guard against undue hindrances to political conversations and the exchange of ideas." *Id.* (citing *Meyer v. Grant,* 486 U.S. 414, 421, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988)). Public interest always comes down on the side of protecting core political speech, especially where, as here, such serious and substantial questions are implicated.[4] The public benefits from free interchange in the marketplace of ideas, especially where a candidate has demonstrated a sufficient modicum of public support.

### III. CONCLUSION

The balance of harms tips decidedly in favor of Plaintiffs. Additionally, as discussed above, Plaintiffs' complaint and motion for preliminary injunction raise serious and substantial questions of law. Moreover, Plaintiffs have shown, with respect to the requirement that circulators must be registered voters, a probability they will prevail on the merits. Finally, the public interest is best served by unrelenting protection of the First Amendment rights of all its citizens. Therefore, the Court **GRANTS** the preliminary injunction requested by Plaintiffs. Defendant Hechler is **ORDERED** to certify Ralph Nader and Winona LaDuke as the Green Party's nominees for the offices of President and Vice President of the United States and to place them and their party on the presidential ballot, without requiring Nader and LaDuke to submit more valid signatures than already approved. Further, Defendant Hechler and his officers, agents, servants and employees are preliminarily **ENJOINED** from enforcing West Virginia Code § 3-5-23(b)'s requirement that circulators be registered voters in West Virginia. This Order shall remain in force and effect pending final judgment on the merits.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record by facsimile transmission and first class mail and publish on the Court website at www.wvsd.uscourts.gov.

---

4. The Fourteenth Amendment applies federal constitutional protections to state actions, frequently raising federalism concerns. Here, the action involves the only national election this country holds, election of president and vice-president of the United States. Considering citizens' rights of national political association to participate fully in that electoral process, national concerns are clearly paramount to state interests.